**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 12-4347

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

        v.

TROY DOUGLAS BAYLOR,

              Defendant – Appellant.

———————————

No. 12-4357

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

        v.

JAMES DERRICK BAYLOR,

              Defendant – Appellant.

———————————

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.   James R. Spencer, District Judge.  (3:11-cr-00064-JRS-2; 3:11-cr-00064-JRS-1)

———————————

Argued:  May 17, 2013              Decided:  August 1, 2013

———————————

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Elizabeth W. Hanes, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellants. Michael Arlen Jagels, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Kevin E. Johnson, KEVIN E. JOHNSON, P.L.L.C., Heathsville, Virginia, for Appellant James Derrick Baylor; Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia; Frances H. Pratt, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant Troy Douglas Baylor. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted James and Troy Baylor of seven counts in a multiple count indictment stemming from the brothers' armed robberies of a Family Dollar store in Chester, Virginia, and Tommy Wilson's Vans & Auto, in Richmond, Virginia. The district court sentenced James Baylor to 514 months imprisonment and Troy Baylor to 624 months imprisonment. In this consolidated appeal, the Baylors raise numerous claims of error. Appellants contend that the district court abused its discretion by rejecting their proposed voir dire questions regarding eyewitness identification; excluding the testimony of their eyewitness identification expert; refusing the Baylors' proposed jury instructions regarding eyewitness identification; and admitting certain testimony offered by the Government's DNA expert.

The Baylors also assert that the Government presented insufficient evidence to support a finding that the object used or carried during one of the robberies met the statutory definition of a "firearm." They alternatively argue that the seven-year sentences imposed on them for violating 18 U.S.C. § 924(c) are constitutionally infirm. For the reasons set forth below, we affirm the district court in all respects.

I.

Viewing the evidence in the light most favorable to the Government, United States v. Moye, 454 F.3d 390, 394-95 (4th

3

Cir. 2006) (en banc), the record demonstrates the following.  On November 30, 2010, the Family Dollar store ("Family Dollar") in Chester, Virginia, was robbed by two men.  Three weeks later, on December 21, 2010, Tommy Wilson's Vans & Auto ("Wilson's Auto") in Richmond, Virginia, was also robbed by two men.  Both robberies were caught on videotape.  Each robbery involved one taller robber who walked with a cane or, alternatively, a limp, and another shorter robber.  Multiple witnesses identified James and Troy Baylor[1] as the two men that robbed each store.  DNA evidence taken from a hat left at Wilson's Auto matched James, although DNA evidence from another hat was inconclusive as to Troy.  Other additional direct and circumstantial evidence confirmed that both robberies were committed by James and Troy Baylor.

## A.

### The Baylor Brothers

James and Troy are brothers and lived in New York until moving to Virginia in 2010.  Upon relocating to Virginia, the brothers stayed with their mother, Leona Baylor, at her residence on Woodhaven Drive in Richmond.  Both brothers also received mail at the Woodhaven address and had belongings there.

---

[1] Like the Baylors in their opening brief, we refer to the Baylor brothers by their first names for the purpose of clarity.

Their mother lived with her fiancé Richard Washington at Woodhaven Drive during the time of the robberies. Leona Baylor and Washington had two vehicles at their residence: a four-door Oldsmobile and a Chevrolet Blazer.

Of note, James has a disability known as a club foot that requires the use of cane.

### B.

### The Family Dollar Robbery

On November 30, 2010, Family Dollar assistant manager Dena Smith arrived at work around 8:00 a.m. Another employee, Diane Miners, a cashier, arrived at the store about two hours later. Shortly after Miners arrived, Smith told Miners that she was going to go to the bathroom and then outside to smoke a cigarette. Upon exiting the bathroom, Smith was approached by a man, later identified as Troy Baylor, who asked for the manager and requested a job application. Smith told him the manager would not be in until the next day, and that she was the assistant manager. Smith also told Troy to go to the front of the store where a computer was located and fill out an application. Smith was about to go outside to smoke when Troy approached her again and asked where the wrapping paper was located. Smith then went outside.

Once outside, Smith was once again approached by Troy. Troy told Smith, "This is what you going [sic] to do. You going

5

[sic] to take us in the back and give us money." J.A. 340.[2] At that point, another man, later identified as James Baylor, approached Smith holding what she believed was a gun. The gun barrel was visible to Smith as it protruded from James's sleeve. They entered the store and walked to the back before Smith stopped and said, "Why we going [sic] to the back of the store? There's no money there." Troy asked Smith, "Where's it at?", to which Smith answered that it was in front of the store. Id. at 342.

Once up front, Troy sat down at the computer and pretended to type. Meanwhile, James stood behind Smith while she entered the combination of the store safe. Once opened, Troy jumped up and took the cash box from Smith, which contained $501.00. Miners then took note and asked Smith, "Dee, what's going on?" Smith told Miners she was "Getting petty cash for my till." J.A. 342. When Troy took the cash box from Smith, Miners told him, "Oh, no you don't." J.A. 343. James told Miners to get back. At that point, the Baylor brothers exited the store and ran across the parking lot.

Outside the store, Rhonda Goad was sitting in her truck in the parking lot. While seated in her vehicle facing

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Family Dollar, she saw the Baylors enter and exit the store several times.

A number of things struck her as peculiar about the two men. One of them walked with a cane and was "crippled on his right leg." J.A. 379. The last time Goad saw the men exit the store, one of them was carrying something under his arm. The two men were in a hurry, so much so that Goad believed they had just shoplifted. Upon exiting the store, the men increased their pace. The "short guy" took off running. Id. at 380. The other man also took off running "with his cane" but fell when he lost his balance on an embankment near the parking lot. Id. at 380. After the men cleared the embankment, Goad saw a car leave from the area in "kind of a hurry." Id. at 382. She described the top of the four door car as dark in color with "chrome around the windows and around the front and back." Id. Goad identified a photo of the Baylors' mother's Oldsmobile as looking like the vehicle she saw.[3]

---

[3] The car was the same vehicle that Troy drove when it ran out of gas several miles from the Family Dollar store nearly three weeks later. During the consensual encounter with police, who assisted Troy by giving him a ride to his girlfriend's nearby apartment, Troy admitted that the car, a 1989 four-door Oldsmobile, was his mother's or his mother's boyfriend's. Troy told the assisting officer that his mother had let him use the car to travel to his girlfriend's residence.

After the robbery, Goad went to the business where she had seen the getaway car parked to see if they'd seen the robbers. She then returned to the Family Dollar and told the clerks she had witnessed the robbery.

1.

Eyewitness Identification

Smith was shown photo lineups of both Baylor brothers and correctly selected each brother and identified the role each played during the robbery. The lineups were done in a "double blind" method, meaning that the detective showing the photos to Smith had no idea who the suspects were. The detective also conveyed to Smith prior to showing her the photos that the suspects may or may not be included in the photos.[4]

2.

Video Evidence

Video from inside the Family Dollar store was taken from several vantage points. One view shows the front doors, while a second view shows the front of the store where the safe is located. A third view shows the register where Miners was working during the robbery.

---

[4] Neither Miners nor Goad were shown a photo spread. They did, however, identify both defendants at trial.

The photo stills of the video show several important details. The hat worn by Troy during the robbery has a small brim on it. The small brim is identical to the hat that Troy was wearing (and that later fell off) during the robbery at Wilson's Auto. James can be seen walking with a limp and with the assistance of a cane. The relative size of the brothers can also be seen in the video, with James being the taller of the two. Finally, the brothers' facial hair can be seen in the video.

## C.

### Wilson's Auto Robbery

On December 21, 2010, three weeks after the Family Dollar robbery, Wilson's Auto was also robbed by two men. On that day, inside the used auto business shortly after 10:00 a.m., Tommy Wilson Sr. and his son Tommy Wilson Jr. were working in a bay toward the rear of the business. As the father and son were speaking in the bay, two men -- one tall and one shorter -- walked into the bay. The men were later identified as Troy and James Baylor. Tommy Wilson Sr. told the men that they were not permitted in that section of the business. James then pulled out a gun and said, "Old man, we don't have to go anywhere." J.A. 543. Troy then ordered the Wilsons to the ground. Tommy Wilson Jr. obeyed and placed money from his pocket on the floor then laid on his stomach toward the rear of the car that was in

the garage, but his father refused to get on the floor. Troy walked over to Tommy Wilson Jr. and took his money, then walked to Tommy Wilson Sr. and searched his pockets, taking his money. The younger Wilson told the men, "You got your money, now get out of here." J.A. 544.

The elder Wilson and James began to argue. James then began to beat Tommy Wilson Sr. on the head with the gun. The younger Wilson then got off the floor to help his father. Troy grabbed the gun and pointed it at Tommy Wilson Sr. Tommy Wilson Jr. then grabbed Troy, dragging him in front of the car. He attempted without success to get Troy to drop the gun by beating his hands on the fender and hood of the car. In the process, the right side mirror of the vehicle broke off.

Searching for something to hit Troy with, Tommy Wilson Jr. grabbed a wiper blade and hit him on the head. The hat that Troy was wearing fell off on the hood of the car. Tommy Wilson Jr. and Troy continued to struggle, during which time Troy's face was less than a foot from Tommy Wilson Jr. Meanwhile, the elder Wilson continued to fight with James.

The brawl between Tommy Wilson Jr. and Troy led to the adjoining front office. Troy took a swing with the gun at the younger Wilson, cutting his nose. By then James and Tommy Wilson Sr. also entered the front office. Tommy Wilson Jr. grabbed James and slammed him down on the desk, then hit him.

10

James fell to the floor. By then, Troy had jumped on the elder Wilson and was "beating on him." J.A. 547. Standing apart from one another, Tommy Wilson Jr. looked at Troy from a distance of several feet away and told him to get out. When the two robbers left the business, Tommy Wilson Sr. followed the path the men took in order to determine the direction in which they fled. The younger Wilson called police and reported the robbery.

At the time of the robbery, Officer Karen Spencer was on patrol several miles away and, upon learning of the robbery, drove toward Wilson's Auto, cutting through a neighborhood adjoining the area near the business. She later testified that she passed a speeding SUV, dark in color, and similar to the Blazer owned by Leona Baylor. Even though she continued on to Wilson's Auto, she noted in her rear view mirror the direction in which the SUV turned. After determining at the scene that the dark SUV she passed had likely been driven by the robbers, she quickly returned to the neighborhood where she saw the SUV. She turned down one of the streets near where she had seen the SUV turn and saw an SUV that "looked exactly like the vehicle" that passed her earlier parked at a house; indeed, she knew the vehicle had been recently driven due to the SUV's warm hood. Additional officers responded to the scene at Woodhaven Drive, located less than two minutes driving time from Wilson's Auto.

11

Detective Christina Benkahla of the Richmond City Police Department responded to the Woodhaven location. She knocked on the door of the residence and was met by Leona Baylor. Once inside, she also met Leona Baylor's elderly "husband." Officer Benkahla observed men's clothing that she described as "younger"-looking likely not worn by the elderly man. J.A. 660. Notably, Officer Benkahla observed mail addressed to Troy Baylor. When asked about whether anyone had driven the SUV, Leona Baylor stated that nobody had driven it.

Following the robbery, Richmond police forensic detectives collected evidence from inside Wilson's Auto, and among the items recovered was a hat located on a car in the rear car bay, a hat on the floor of the front office, and a firearm. Video that recorded events inside and outside the business were also recovered.

D.

The Arrests

On January 4, 2011, Virginia State Trooper Jeffrey Hanna was on routine patrol in Richmond when he noticed a dark colored SUV traveling with no rear lights. Hanna stopped the vehicle and asked the driver for identification. The driver identified himself as Alfago Tillman. James and Troy Baylor, along with an unidentified female, were passengers in the SUV driven by Tillman. Trooper Hanna then asked everyone in the

12

vehicle for identification. Upon running their information through a police database, Trooper Hanna learned that there were outstanding arrest warrants for James and Troy Baylor. The brothers were taken into custody and turned over to Richmond police, and the SUV impounded. The SUV, a Chevrolet Blazer, was registered to Leona Baylor.

Once in custody, Richmond police confiscated the clothing and belongings in possession of James and Troy at the time of their arrest. The clothes worn by James were identical to clothes he was wearing in the video of the Wilson's Auto robbery. James had a cane in his possession although it was not confiscated so that he could use it in jail. Items in Troy's possession upon his arrest included keys to the Chevrolet Blazer, other vehicles, and his mother's residence on Woodhaven Avenue. The bracelet and boots worn by Troy when he was arrested match those he wore during the Wilson's Auto robbery, evidence that was captured on video.

In addition, cheek swabs were taken from both Troy and James to compare to DNA taken from the items found at Wilson's Auto. Melissa Baisden, an employee at the Virginia Department of Forensic Science, analyzed the DNA evidence and developed DNA profiles from Troy, James, and Tommy Wilson Sr., and from the hat recovered from the front office at Wilson's Auto and the firearm recovered from Wilson's Auto. The DNA profiles from

13

James and the hat matched.  James was thus identified as a "major contributor" to the DNA found on the hat.  When Baisden compared the DNA to determine if Troy could also be eliminated as a minor contributor to DNA on the hat, her results were inconclusive, meaning she could not determine, due to insufficient DNA information, whether Troy should be eliminated as a contributor.

1.

Eyewitness Identification

Detective Jack Larry compiled a photo lineup of Troy Baylor and, later, James Baylor.  Larry showed the photos separately to Tommy Wilson Jr. and Sr. on December 30, 2010. The younger Wilson identified Troy as one of the robbers.  When he was later shown photos that included James, he did not select anyone, indicating that he did not get as good a look at the taller robber.  Tommy Wilson Sr. was also shown photo lineups that included the Baylor brothers.  He correctly selected a photo of James, noted below the photo "out of all picture [sic] this is one I picked.  He & I fought . . . [he] hit one fist and gun on top of my head & he and I pushed each other."  J.A. 999. The elder Wilson incorrectly selected a photo from an array that included Troy.

2.

## Video Evidence

Video cameras captured events from outside of Wilson's Auto as the Baylor brothers walked into and away from the business, and a video from a nearby business captured the men getting out of a Chevrolet Blazer. The Blazer can be clearly seen and is similar to the Blazer owned by Leona Baylor. Video also shows the brothers entering the business then walking to the rear bay behind the front office. James can be seen limping when he enters and walks into the business, with his right foot appearing angled to the right as he walks. Moreover, while struggling with the elder Wilson, Troy placed his right hand on a desk, allowing the video to record a bracelet on his right hand, which is similar to and on the same hand as the bracelet found on Troy when he was arrested. The boots worn by Troy when he was arrested also match those worn during the robbery.

E.

## The District Court Proceedings

On March 1, 2011, a federal grand jury indicted the Baylors on numerous charges relating to the Family Dollar and Wilson's Auto robberies. Count one alleges a conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Counts two through four allege, respectively, three offenses relating to the robbery of the Family Dollar on November 30, 2010: the

15

substantive count of robbery, in violation of § 1951; the use or carry of a firearm during and in relation to that robbery, in violation of 18 U.S.C. § 924(c); and the possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Counts 11 through 13 charged the Baylors with the same offenses in connection with the Wilson's Auto robbery on December 21, 2010. Counts five through ten, relating to other robberies, were dropped before trial.

1.

Motion to Exclude Expert on Eyewitness Testimony

Before trial, the Government moved to exclude a defense expert expected to testify at trial about how certain factors affect the accuracy of eyewitness identification. Specifically, Dr. Brian Cutler's proposed testimony was to address factors including, among other things, the effect of stress on the accuracy of identification, cross-race identification, and witness confidence versus accuracy. After the hearing, the district court granted the Government's motion, ruling that the understanding of each factor was within the common knowledge of jurors such that expert testimony would not be helpful. As to the cross-race identification and eyewitness confidence factors, the district court determined that because the expert's research did not quantify the accuracy of white eye witnesses identifying African-American suspects, there would be

16

a high risk that the testimony would confuse and mislead the jury. The district court concluded, "[t]he jurors' common sense and powers of observation, along with an appropriate instruction from the Court, are all that is needed for the jurors to judge the eyewitness identification in this case." United States v. Baylor, 3:11-CR-64, 2011 WL 5910061, at *8 (E.D. Va. Nov. 28, 2011).

### 2.

### Motion to Exclude Part of the Forensic Analyst's Testimony

Before trial, Troy moved to exclude a portion of the testimony of the Government's forensic analyst on grounds of relevance. Specifically, Troy highlighted the expert's finding that she could not draw a conclusion as to whether he was a contributor to the minor DNA profile she had developed from one of the hats recovered after the Wilson's Auto robbery. The Government opposed the motion. The court held a hearing and denied the motion. The district court concluded that the testimony was relevant and therefore admissible because it spoke directly to the material fact that Troy could not be ruled out as a possible minor contributor to the DNA on the hat.

### 3.

### Voir Dire

Before trial, the Baylors submitted proposed voir dire questions pertaining to eyewitness identification issues. The

17

Government objected to the asking of these questions, arguing that the defendants' concerns would be properly covered by the jury instructions.  During voir dire, the court did not ask any questions specifically addressing the issue of eyewitness identification.  When the district court inquired at the end of voir dire if the parties wanted any further questions asked, Troy's counsel reminded the court of his request for questions about eyewitness identification.  The district court refused.  When James's counsel inquired about his specific questions relating to eyewitness identification, the court responded that it would not ask them because "we have instructions to deal with that."  J.A. 297.

### 4.

### Trial

At the close of the Government's evidence, the defense moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal on several counts.  With regard to the Family Dollar § 924(c) charge (count three), the Baylors argued that the Government had not established that the object that Dena Smith saw was in fact a firearm.  The district court denied the motion.

The Baylors also requested a specific jury instruction regarding eyewitness identification.  The district court refused to give the instruction, stating, "Obviously, we had plenty of

18

cross-examination on it and you can argue it all you want." J.A. 750. The jury found both men guilty on all counts.

5.

Sentencing

The presentence reports prepared on each Baylor brother recommended that a seven-year mandatory minimum sentence apply to the count three violation of 18 U.S.C. § 924(c). Count three charged that the Baylors "did knowingly and unlawfully use and carry a firearm during and in relation to a crime of violence," namely, the robbery of the Family Dollar store on November 30, 2010. J.A. 16-17. However, count three did not allege that the firearm was brandished during the robbery. Troy objected to the recommendation, arguing that if the district court adopted it, the court would necessarily be making a finding of fact that would raise the mandatory minimum, thus violating his rights under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The district court overruled the objection, relying on the Supreme Court's decision in Harris v. United States, 536 U.S. 545, 556 (2002) (concluding that brandishing is a sentencing factor to be found by the judge, not an offense element to be found by a jury). After overruling the objection, the court sentenced Troy to 624 months imprisonment and James to 514 months imprisonment. Judgments were entered on April 24,

2012.  Troy timely noted his appeal on May 3, and James, on May 4.

## II.

## A.

### The Proposed Voir Dire Questions

#### 1.

##### Standard of Review

The Baylors first contend that the district court improperly refused to ask prospective jurors questions regarding the specific issue of eyewitness identification, a decision we review for abuse of discretion.  See United States v. Jeffery, 631 F.3d 669, 673 (4th Cir. 2011).

#### 2.

##### Analysis

We must "examine the voir dire as a whole to determine whether it was reasonably sufficient to probe the prospective jurors for bias and partiality."  United States v. Lancaster, 96 F.3d 734, 742 (4th Cir. 1996).   Even so, district courts are not required to ask every question that counsel believes is appropriate.  See Fed. R. Crim. P. 24(a).

In this case, the questions proposed by the Baylors essentially argued factual points instead of attempting to identify jurors' bias or partiality, the ultimate goal of voir dire.  That is, the proposed questions were designed to suggest

20

to prospective jurors that forensic data is preferable to eyewitness identification, the reliability of an eyewitness identification is increased with time viewing a suspect, and eyewitness identification is less reliable with the passage of time between the crime and the identification, among others suggestions. We conclude the district court did not abuse its discretion by rejecting the proposed voir dire questions because when viewed in its totality, the district court's voir dire was reasonably sufficient to achieve the ultimate goal of voir dire that is, to probe prospective jurors for bias or partiality.

B.

The Exclusion of the Eyewitness Identification Expert

1.

Standard of Review

We review a district court's ruling regarding the use of expert testimony for abuse of discretion. See United States v. Davis, 690 F.3d 226, 257 (4th Cir. 2012).

2.

Analysis

We conclude the district court did not abuse its discretion by excluding the testimony of an expert in eyewitness identification, where evidence of the two robberies involved far more than isolated eyewitness identification: it included video of both robberies, DNA evidence linked to one of the defendants,

21

identification by five eyewitnesses, and other direct and circumstantial evidence.

The Baylors argue the district court abused its discretion by denying expert testimony as it pertained to three factors -- (1) effect of stress on accuracy of identification; (2) cross-race identification; and (3) witness confidence versus accuracy. The district court ruled that the stress factor was a matter of common knowledge to the jury. As to cross-race identification, the district court concluded that the risk of confusion as a result of the testimony substantially outweighed the probative value of such testimony. And as to witness confidence, the district court determined that this vague guidance would only serve to confuse the jury, and would risk misleading the jury as to their role as trier of fact. The district court concluded, "The jurors' common sense and powers of observation, along with an appropriate instruction from the Court, are all that is needed for the jurors to judge the eyewitness identifications in this case." United States v. Baylor, 3:11-CR-64, 2011 WL 5910061, at *8 (E.D. Va. Nov. 28, 2011).

In United States v. Harris, 995 F.2d 532 (4th Cir. 1993), we affirmed the exclusion of expert testimony on the reliability of eyewitness identification, but acknowledged that such testimony should be admitted under "narrow circumstances."

22

<u>Id.</u> at 535.[5]  Federal Rule of Evidence 702 sets the standard for the admissibility of expert testimony, and provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.  We have previously explained that district courts possess broad discretion in evaluating when expert testimony will be helpful:

> As Rule 702 indicates, expert testimony is only permitted if it assists the trier of fact to understand evidence or to determine a fact in issue. The exclusion of expert testimony under Rule 702 is within the sound discretion of the trial judge. Exercising its discretion, the court should consider whether the testimony is within the common knowledge of the jurors.  This type of evidence, almost by definition, can be of no assistance to a jury.

<u>Harris</u>, 995 F.2d at 534 (internal citations omitted).

In view of the facts of this case, we reaffirm the central teaching of <u>Harris</u>: "Outside of such narrowly constrained circumstances, jurors using common sense and their

---

[5]  We cited examples of cases where the "narrow circumstances" were present in order to support the introduction of expert testimony.  <u>See</u> <u>Harris</u>, 995 F.2d at 535 (citing, among others, <u>United States v. Sebetich</u>, 776 F.2d 412, 418-19 (3rd Cir. 1985) (holding erroneous the exclusion of expert testimony where the identification came nineteen months after the robbery, it was made under stressful circumstances, and it was only derived from one person's testimony)).

faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination."  Id.

Like Harris, the narrow circumstances that would permit the testimony of an eyewitness identification expert are not present in this case.  First, the facts do not support the argument that the Baylors' identifications were suspect.  Both robberies in this case were videotaped.  Without any eyewitness identifications, jurors could have decided for themselves that both Baylors committed these crimes.  From the videotapes, jurors were able to 1) observe James's disability through the use of a cane at Family Dollar and a very evident limp at Wilson's Auto; 2) observe the relative size difference between the brothers; 3) compare the matching clothing worn by James at Wilson's Auto with that worn upon his arrest; 4) compare the matching bracelet worn on Troy's right wrist with the bracelet worn on his right wrist upon his arrest; and 5) compare the unique brim on the hat Troy wore at Family Dollar with the hat that fell off his head at Wilson's Auto.

Jurors also saw videotape and photos of the black SUV that the Baylors drove to and from Wilson's Auto.  They heard testimony from a responding officer who saw the SUV pass her at a high rate of speed and turn onto a neighborhood street.  The

24

jury also heard that police found the SUV at the home of Leona Baylor and heard that both Baylor brothers were living there. The SUV was the same vehicle that the Baylors were in upon their arrest. The jury heard that Troy had keys to the SUV, along with keys to his mother's house. The jury heard that Troy also drove another car belonging to his mother, an Oldsmobile with a dark top and chrome surrounded windows. The same car was identified as similar to the getaway car used by the Baylors at Family Dollar.

Finally, jurors heard from five eyewitnesses who identified the Baylors as the robbers -- three from Family Dollar and two from Wilson's Auto. The main witness from Family Dollar, Dena Smith, is an African-American like the Baylors. In addition, many of her interactions with Troy were not stressful, as they occurred <u>before</u> the robbery. Likewise, Rhonda Goad's observations were made from the peaceful interior of her parked car. Diane Miners did not even realize that the store was being robbed until she saw Smith opening the safe. The witnesses from Wilson's Auto had extended interactions with the Baylors. Each witness wrestled with a Baylor brother. Tommy Wilson Jr. was less than a foot away from Troy during the struggle.

Regarding witness confidence, some of the eyewitnesses who identified the brothers expressed confidence in their identifications, while others were not 100% confident. For

25

example, Tommy Wilson Sr. indicated on the photo of James he selected that James's picture was the one that most looked like the suspect he had the most interaction with during the robbery. This point was highlighted by counsel during cross-examination.

The record here shows that the jury was made keenly aware that identification was a key issue and that they would need to determine whether the prosecutor's witnesses were credible regarding their identification testimony. This was accomplished through the skillful cross-examination of the prosecution witnesses regarding the description of the suspect and subsequent identification of the Baylors,[6] the presentation of alibi testimony, the closing arguments,[7] and the jury

---

[6] For example, on cross-examination of Tommy Wilson Jr., counsel for James asked the following question:

Q. In your testimony, you stated that you did not get a good look at the taller man. And it is the case that more than a year ago, you could not place him when you were shown the photo line-up; is that accurate?

A. Yes, sir.

J.A. 568.

[7] For instance, during closing argument, Troy's attorney questioned the reliability of Dena Smith's eyewitness testimony arguing, in part, as follows:

And so sure, there's a couple, you know, seconds there where [the Baylors and Smith] have this conversation. What you hear from her is that she is focused on this gun. And I would be. I'm sure anyone would be. And she tells you she is not familiar with what she sees
(Continued)

26

instructions on judging the credibility of witnesses in general, and the reliability of witness identification testimony in particular.[8]

Accordingly, the district court did not abuse its discretion in precluding expert testimony regarding the unreliability of eyewitness identification.

## C.

### The Proposed Jury Instructions

#### 1.

##### Standard of Review

The standard of review for a district court's refusal to give a specific eyewitness identification jury instruction is abuse of discretion. See United States v. Brooks, 928 F.2d 1403, 1408 (4th Cir. 1991). A refusal to grant a requested

---

and what she thinks is a weapon and she is flipping out and you can see that. At the end of the tape, you hear it from every single person, that she is distraught. . . . And so what you can see from just a brief timeline is that Dena Smith had a brief interaction with these individuals. And from that interaction, it would be difficult to know who the right person might be.

J.A. 798–99.

[8] The district court instructed the jury, in part, as follows: "In testing the credibility of the witnesses, you may consider . . . the opportunity they had to see, hear, and know the things about which they testified." J.A. 832.

instruction is only reversible error if the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.  See United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995) (internal quotation marks and citations omitted).

2.

Analysis

In our view, the district court did not abuse its discretion by refusing the Baylors' proposed jury instruction regarding eyewitness identification.  We reach this conclusion because the evidence against both brothers did not strongly suggest the likelihood of irreparable misidentification, any concerns regarding poor identification procedures and misidentification were raised on cross-examination and during opening and closing arguments, and the issue of credibility and witness identification testimony was substantially covered by the court's charge to the jury.

In United States v. Holley, 502 F.2d 273 (4th Cir. 1974), we adopted a detailed model jury instruction on eyewitness identification testimony "in the context of a case that contain[ed] no evidence of identification except eyewitness testimony."  Id. at 275.  We later refined this view in Brooks,

28

where we concluded that a Holley instruction is "compelled only where the evidence in the case strongly suggests the likelihood of irreparable misidentification." Brooks, 928 F.2d at 1407 (internal quotation marks omitted). We "generally require[] a Holley [] instruction when the only evidence of a defendant's criminal agency is eyewitness identification testimony." United States v. Greene, 704 F.3d 298, 301 (4th Cir. 2013). "'The Holley [] instruction or its substantial equivalent is not required to be given, sua sponte, in a case where other independent evidence, whether direct or circumstantial, or both, is presented to the trier of fact which is corroborative of the guilt of the accused.'" Id. at 313 (quoting United States v. Revels, 575 F.2d 74, 76 (4th Cir. 1978)).

The circumstances present in Holley are not present in this case. Importantly, as described above, the Government's case was not wholly dependent on eyewitness identification. Far from it. With respect to the Family Dollar robbery, the evidence tending to inculpate the Baylors, including video recordings, was legion. See ante at 5-9. Likewise, the case against the Baylors in the robbery of Wilson's Auto was not dependent solely on eyewitness identification testimony. See ante at 9-12.

The facts presented here take this case well-beyond Holley's purview. Certainly the wealth of evidence against both

29

Baylors does not strongly suggest the likelihood of irreparable misidentification. In addition, any concerns regarding poor identification procedures and misidentification were raised on cross-examination and during opening and closing arguments. Therefore, the district court did not abuse its discretion in refusing the proposed jury instructions.

D.

The Government's DNA Expert

1.

Standard of Review

The Baylors contend that the district court abused its discretion by permitting Melissa Baisden, a DNA expert, to testify about the inconclusive results of her test of whether Troy could be eliminated as a contributor to the minor profile of DNA located on a hat recovered after the robbery at Wilson's Auto. We review questions regarding the admissibility of evidence for an abuse of discretion. See United States v. Summers, 666 F.3d 192, 197 (4th Cir. 2011).

2.

Analysis

Troy first attacks Baisden's testimony as irrelevant. See Fed. R. Evid. 403. This is plainly not so: Baisden's testimony was relevant and therefore admissible because it had a tendency to make the existence of a fact that was of consequence

30

to the determination of the action more or less probable.  See Fed. R. Evid. 401.  That is, her testimony spoke to the material fact that Troy could not be ruled out as a possible minor contributor to DNA on the hat.  This fact, as correctly testified to by Ms. Baisden on direct and again pointed out by Troy's attorneys on cross-examination and during closing argument, did not mean that Troy was a contributor to the minor DNA profile found on the hat.

Nor was Baisden's evidence irrelevant and confusing. The testimony actually assisted the trier of fact to understand the evidence or determine a fact in issue, rather than confuse them, by helping the jury to determine the outcome of the DNA analysis as to Troy.  See Fed. R. Evid. 403.  To exclude Baisden's testimony would have permitted a false inference by the jury and led to the confusion that Rule 702 is meant to prevent.  That is, the jury would have heard that DNA evidence was recovered from the hat, that it was tested by an analyst, but they would not have heard the results.  The natural inference would be that Troy could be eliminated as a contributor to the minor DNA mixture, which was not accurate.

Accordingly, we conclude the district court did not abuse its discretion by admitting testimony of a DNA expert to explain an inconclusive finding for Troy, because the evidence

31

was relevant, admissible, and assisted the trier of fact in understanding the evidence or determining a fact at issue.

E.

Firearm Possession and "Brandishing"

The Baylors also raise two claims of error regarding their respective convictions for violating 18 U.S.C. § 924(c) as to the Family Dollar robbery as charged in count three of the indictment.[9] Section 924(c) of Title 18 prohibits persons from using or carrying a "firearm" in the commission of a crime of violence. First, the Baylors claim the Government presented insufficient evidence in support of the finding that the object used or carried during the robbery met the definition of "firearm." Alternatively, they contend that the seven-year sentences imposed on them as a result of their count three convictions are unconstitutional because the indictment did not allege, and the jury did not find, that a firearm was brandished.

---

[9] The Baylors do not raise this issue with respect to the robbery of Wilson's Auto.

32

1.

The Sufficiency of the Evidence

a.

Standard of Review

We review de novo a district court's denial of a motion made pursuant to Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal. See United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). We must uphold a jury verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support it. See Burks v. United States, 437 U.S. 1, 17 (1978). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). "In applying this standard of review, we remain cognizant of the fact that '[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.'" Id. (quoting United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994)).

b.

Analysis

We agree with the Government that Smith's testimony, together with the other evidence, was sufficient to establish the Baylors' possession of a firearm.  In this case, Dena Smith testified "the taller guy . . . he had a gun in his arm sleeve." J.A. 341.  Ms. Smith testified that the taller man then said, "Now, this is what you going [sic] to do.  Take us in the back and give us the money."  J.A. 341.  According to Smith, "[h]e had the gun in his arm sleeve but it weren't [sic] like pointing at me.  The barrel was inside of his sleeve so he just had it laying in his palm."  J.A. 363.  Smith further testified, "the barrel was in the sleeve.  The part where fire come out of." Id.  While she conceded that she wasn't familiar with the parts of the gun, she explained, "But I know the part that you hold, that was in his sleeve so the part where the bullet come out of [sic] was pointing out in his palm."  J.A. 363.  Upon seeing the gun, Smith testified that she thought, "Oh, God."  J.A. 341.

The direct evidence of Smith's observations along with the direct and circumstantial evidence of both the Baylors' actions as already catalogued were more than sufficient, particularly when viewed in the light most favorable to the Government, for a rational jury to find both Baylors guilty of violating § 924(c).

34

## 2.

### Brandishing

The Baylors also contend the district court violated their constitutional rights by imposing mandatory seven-year sentences based on a question of fact not submitted to the jury because count three of the indictment, which charged that the Baylors violated 18 U.S.C. § 924(c) in connection with the Family Dollar robbery, failed to allege that the gun was brandished.  Until recently, Appellants' argument was foreclosed by Harris v. United States, 536 U.S. 545, 556 (2002), a decision concluding that brandishing is a sentencing factor for the judge to find, rather than an element that must be found by the jury.  However, in Alleyne v. United States, ___ U.S. ___, 133 S. Ct. 2151 (2013), the Supreme Court expressly overruled Harris and concluded that the brandishing enhancement in § 924(c) must be submitted to the jury.  Therefore, under Alleyne, Appellants were subject to an improper mandatory minimum because the brandishing factor was not alleged in the indictment or found by the jury.  The question for us, then, is whether the error was harmless.

### a.

### Standard of Review

Apprendi errors are subject to harmless error review.  See Washington v. Recuenco, 548 U.S. 212 (2006).  The Supreme

Court has "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, 'most constitutional errors can be harmless.'" Id. at 218 (quoting Nedar v. United States, 527 U.S. 1, 8 (1999)). "[I]n the context of a particular case, certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the factfinding process at trial." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Id.

b.

Analysis

Section 924(c) provides a mandatory, and consecutive, term of five years of imprisonment upon conviction for using or carrying a firearm in the commission of a crime of violence. 18 U.S.C. § 924(c)(1)(A)(i). "[I]f the firearm is brandished," however, a defendant must be sentenced to a mandatory, consecutive seven-year term of imprisonment. § 924(c)(1)(A)(ii). Congress defined the term "brandish" in 18 U.S.C. § 924(c)(4) as follows: "'brandish' means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another

36

person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person."

In this case, the record below amply supports the conclusion that a firearm was brandished by the Baylors during the robbery of the Family Dollar. The jury was asked and ultimately found that a weapon was present, that is, "possessed." The only other element needed to satisfy the definition of "brandish" is the act of displaying or making the presence of the firearm known for the purpose of intimidation, which as Smith's testimony indicates, was also established. Smith testified that she encountered the Baylors outside of her store shortly after Troy had approached her with questions several times inside the store. When asked what happened when she was confronted by the Baylors outside of the Family Dollar, Smith answered:

A. When the taller guy, before he was out there, he had a gun in his arm sleeve. He was like, "Now, this is what you going [sic] to do. Take us in the back and give us the money," or whatever. He had a gun in his arm sleeve but it weren't [sic] like pointing at me. The barrel was inside of his sleeve so he just had it laying in his palm. That's when I asked to put my hands in my pocket and I was like, "Oh, God."

Q. You saw the gun?

A. Yes.

37

J.A. 341. She again testified, that "the barrel was in the sleeve. The part where the fire came out of." J.A. 363.

As her testimony plainly demonstrates, James displayed at least part of the firearm with the aim of intimidating Smith -- and succeeded. We thus conclude that if the indictment had so alleged, the jury would have found beyond a reasonable doubt that the firearm was "brandished," thus justifying the imposition of the seven-year mandatory minimum. Accordingly, even though, per Alleyne, it was error to impose the mandatory minimum without asking the jury to specifically find whether the firearm was "brandished," the record as a whole demonstrates beyond a reasonable doubt that it was brandished, and thus the error is harmless.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

38