UNITED STATES of America,
Plaintiff–Appellee,

v.

Eddie BROOKS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

William JOHNSON,
Defendant–Appellant.

Nos. 90–5461, 90–5464.

United States Court of Appeals,
Fourth Circuit.

Argued July 17, 1990.

Decided March 28, 1991.

As Amended May 6, 1991.

Jerome Patrick Aquino, Alexandria, Va., for defendant-appellant Brooks.

Drewry Bacon Hutcheson, Jr., Alexandria, Va., for defendant-appellant Johnson.

Cathleen Ann Tutty, Asst. U.S. Atty., argued (Henry E. Hudson, U.S. Atty., Debra S. Straus, Sp. Asst. U.S. Atty., on brief), Alexandria, Va., for plaintiff-appellee.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendants Eddie Brooks and William Johnson were tried under an indictment charging them with assault with intent to kill Charles R. Ford. The three—the two alleged assailants and the victim—were at the time of the assault inmates of the Lorton Correctional Institute, a penal institution of the District of Columbia, located in Lorton, Virginia, under Congressional authorization. The defendants were tried in the United States District Court for the Eastern District of Virginia. After the completion of the testimony and jury instructions, the case was submitted to the jury, which found both defendants guilty. By their appeal, Brooks and Johnson claim error in a number of trial rulings. We find none meriting reversal and accordingly affirm the convictions.

I.

One of the aggressors (Johnson) and the victim in the alleged assault (Ford) were roommates in Dorm 11 of the Annex at the Lorton Central Facility, and the other aggressor (Brooks) lived in Dorm 16 of the same Annex. Brooks was Johnson's nephew, and he had a practice of visiting his uncle in Johnson's dormitory practically every day. About 5:30 P.M. on February 19, 1989, Ford entered the Annex where Dormitory 11 was located. As he closed the door, he was waylaid and assaulted, according to his testimony, by Brooks and Johnson. Both Johnson and Brooks had knives. They began attacking Ford with their fists and knives. It seems that during the assault Johnson was behind Ford, and Brooks was confronting Ford. Both assailants stabbed Ford repeatedly, though it seems that Brooks was the more successful in injuring Ford. Ford received multiple injuries in the assault. One of these injuries was a serious, death-threatening stab to the abdomen. Others, less serious, were at various points about his chest or in his back. Ford disengaged himself from the assault, rushing out the door and to the prison infirmary where he was given emergency treatment. After this emergency treatment, he was taken promptly to the Dewitt Hospital at the facility and later to the hospital at Fort Belvoir. He remained in the latter hospital for approximately six weeks and underwent surgery on three occasions because of his injuries suffered in the assault.

An investigation of the assault began almost immediately. The first officer to interview Ford on the night of the assault was Sergeant James L. Shipley of the D.C. Department of Corrections. Sergeant Shipley saw Ford at the emergency room of the Lorton infirmary where he had rushed after the assault. When asked if he knew his assailants, Ford affirmed he did, but he did not at first name either Brooks or Johnson. Shipley explained that Ford seemed to be "very frightened, agitated and frightened" and appeared reluctant at the time to name his assailants. Ford said that he would tell the officer the names of his assailants "in two days." An hour and a half or two hours later, when Ford had been taken to the DeWitt Hospital, he did identify voluntarily Brooks as one of his assailants in a second interview by Sergeant Shipley. He also described at the time the attire which Brooks had on at the time of the assault, and the description accords with Brooks' appearance on February 19. It was some two weeks later that Ford named Johnson as the other assailant.

Sometime after the assault, Ford encountered at the hospital Charles Little, a fellow inmate at Lorton, who was at the time either visiting or being treated at the hospital. Ford and Little began a discussion, and Ford referred to his injuries at the hands of Brooks and Johnson. Little knew Brooks and Johnson well. In fact, he was said to have had a prior romantic relationship with Johnson. He told Ford he had seen Johnson and Brooks on the afternoon of February 19. He added that Johnson

and Brooks told him that an assault was going to be carried out in a short time, and the two of them invited him (Little) to witness it. Little said he did not want to. He did, though, go to the television room near the Annex, where he had a clear view of the entrance to the Annex. While there, he saw Ford enter the Annex and observed him shortly thereafter emerge bleeding and clutching his side. He shortly afterwards saw Brooks leave the Annex but did not observe Johnson come out.

Other prosecution witnesses also testified. One of these witnesses was Corporal Iris Hunt, who was in charge of the infirmary on the night of February 19. She gave Ford emergency treatment. She also prepared the report on Ford's admission and condition when he came to the infirmary. At that time, Ford indicated to Officer Hunt that he had been assaulted by two or more inmates.

Brooks in his defense called two fellow inmates, who testified they had been with Brooks for some time after five o'clock the afternoon of February 19 and until time to retire that night. Defendants did not testify. The district judge submitted the case to the jury, and it returned a verdict of guilty against both defendants. The district court, referring to the Sentencing Guidelines, sentenced Brooks to 151 months on Count I, 120 months on Count II, and 22 months on Count IV, all to run concurrently beginning after completion of the sentence Brooks was currently serving. Johnson was sentenced to 240 months on Count I, 106 months on Count II, and 22 months on Count III. The sentences under Counts I and II were to run concurrently beginning after completion of the sentence Johnson was currently serving, but the sentence under Count III was to run consecutively to Counts I and II.

## II.

The defendants raise as their first claim of error that the district judge improperly refused to give on request the cautionary eyewitness identification instruction, as set forth in *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972). It is their position that the giving of such instruction, on request, is an inflexible requirement where there is important identification testimony. They trace this absolute rule to two District of Columbia Circuit decisions, one of which has given its name to the so-called rule, and to two cases in our Circuit in which such rule is said to have been adopted. We are not persuaded by this reasoning. Neither the two District of Columbia decisions nor the two cases from our Circuit cited by the defendants establish in our opinion any such rule, as a careful review of these cases will demonstrate. We begin by considering the two District of Columbia Circuit decisions.

In *Jones v. United States*, 361 F.2d 537 (D.C.Cir.1966), the first of such cases cited by the defendants, the defendant was charged with the robbery of a Texaco service station. The identification of the defendant depended entirely on the eyewitness testimony of the night manager of the filling station. The defendant urged that he was entitled to a special instruction on the identification of this night manager's testimony, relying for authority on an earlier decision of the same court in *Salley v. United States*, 353 F.2d 897 (D.C.Cir. 1965). The latter case was a narcotics case in which the eyewitness was a narcotics officer. The court in *Salley* remarked that the officer in question often was involved in as many as a hundred cases where his identification testimony was critical. "During that time he meets many people, making buys from some and not from others. The possibility of error due to mistake and the fallibility of human memory is obvious." *Id.* at 898–99. Quoting from *Salley*, the *Jones* court made sure to note that the earlier decision was limited to the specific facts in that type of case (a narcotics case where the identification depended on an officer's testimony first given some months after the event and after the officer had been involved in many other cases where he had testified as an identifying witness):

A requested instruction specifically bringing this defense of mistaken identity to the *jury's attention in a narcotics case must be given*. The trial judge was

not obligated to give the charge in exactly the words requested by defense counsel.

*Jones,* 361 F.2d at 542 (emphasis in original). The court in *Jones* then addressed its own facts and, in upholding the failure to give a mistaken identification instruction, it declared:

> In our present case involving an armed robbery, there is no claim whatsoever that the complaining witness' identification of the defendant was in any way complicated or discredited by any related experience as the victim of a crime of violence. Our concern of a possible error of memory on the part of an undercover narcotics agent attempting to isolate in his recollection the identity of one participant in as many as a 100 similar transactions does not stretch to the same degree of concern for the reliability of the memory of a robbery victim who has had opportunity to see the face and physical characteristics of his assailant. We, accordingly, regard the doctrine of the *Salley* case as addressed specifically to the question therein presented, *id est,* identification in multiple unrelated narcotics purchase cases.

*Id.*

▆ In *United States v. Telfaire, supra,* the second case cited by the defendants, the District of Columbia Circuit dealt with another robbery. There, the court, though it did include an extended form of identification instruction to be given in those particular cases where there were "special difficulties" connected with identification testimony, held that the failure of the district court to give an identification instruction did not prejudice the defendant and again affirmed the conviction in this case. In so doing, it said:

> Moreover, *this case exhibits none of the special difficulties often presented by identification testimony that would require additional information be given to the jury in order for us to repose confidence in their ability to evaluate the reliability of the identification.* Here the victim had an adequate opportunity to observe, and the testimony re-

vealed a spontaneous identification of the defendant in the lobby of the hotel where the robbery took place as soon as the complainant entered the lobby with the police officers. The absence of a special identification instruction did not prejudice appellant's defense.

*Telfaire,* 469 F.2d at 556–57 (emphasis added). It is obvious from this language that *Telfaire* does not purport to compel in every case where there is significant identification testimony an extended instruction on the reliability of identification testimony; it is only where there are "special difficulties" inherent in the identification testimony that such instruction is compelled. In *Telfaire,* the court, as we have seen, did not present the "special difficulties" requiring the special identification instruction.

So much for the District of Columbia authorities. It is manifest from those decisions, including even the one which is identified as the father of the rule expressed by the plaintiffs, that the requirement of a cautionary instruction on identification issues is not an absolute rule but is a flexible one to be applied in connection with the facts of the particular case under review. In both of the District of Columbia cases, the court applied a flexible rule under which the failure to give the cautionary instruction was found *not to be error.*

We now address the two decisions of our own Circuit cited by the defendants. The first of such cases is *United States v. Levi,* 405 F.2d 380 (4th Cir.1968). There, the question was not whether a special identification instruction was required when there was " 'a very substantial likelihood of irreparable misidentification,' " but whether "the testimony of one eyewitness is sufficient [evidence] for the purpose of identification" of the defendant as to permit the submission of the defendant's guilt to the jury. *Id.* at 382–83. *Levi* is obviously irrelevant to the issue posed by the defendants here since the Court did not find prejudice in the failure to give a specific identification charge.

*United States v. Holley,* 502 F.2d 273 (4th Cir.1974), the second Fourth Circuit case cited by the defendants, is more on

point. In that case, a prosecution for bank robbery turned on the "one-on-one positive identification" testimony of a single witness, the security guard Cipra. The robbers all wore "caps pulled down and turtleneck sweaters pulled up to partially conceal their faces." One of the robbers threatened Cipra and shot at him. After the robbery, numerous photographs, including one of the defendant, were exhibited to Cipra, but Cipra was unable to make an identification. Four months later, an FBI agent took Cipra to a large cell at the Portsmouth jail containing about ten prisoners, including the defendant. Cipra identified the defendant as one of the robbers and later identified him as such at the trial. However, two other employees of the bank, one of whom had equal opportunity with Cipra to see the defendant, were unable to identify the defendant as one of the robbers. *Id.* at 274. The defendant requested a *Telfaire* instruction. After the request was denied and after the defendant's conviction, this appeal followed, charging error in failing to give the *Telfaire* instruction. In disposing of that appeal, we began by stating:

> In *Telfaire* the District of Columbia Circuit adopted generally for judges within the district a model instruction, using material from Judge Aldisert's opinion in *United States v. Barber*, 442 F.2d 517 (3rd Cir.1971), but permitting variation and adaptation to suit the proof and contentions of a particular case. We now do likewise as to the district judges in this circuit. As an appendix to this opinion, we reprint the *Telfaire* model instruction. Prospectively, *we shall view with grave concern the failure to give the substantial equivalent of such an instruction, but it is not our purpose to require that it be given verbatim.*
>
> In adopting the *Telfaire* rule, we do so, of course, in the context of a case that contains no evidence of identification except eyewitness testimony.

*Id.* at 275 (emphasis added). We proceeded then to restate our language in *United States v. Salley*, 360 F.2d 699, 702 (4th Cir.1966), that "the law 'must be applied within the context of the facts as developed

in a given case, and the trial judge's instructions to the jury must reasonably relate to the factual situation of the case.'" *Holley*, 502 F.2d at 275. We concluded by declaring that "the identification testimony [in *Holley*] was so lacking in positiveness as to strongly suggest the 'likelihood of irreparable misidentification,' *Simmons v. United States*, 390 U.S. 377, 384 [88 S.Ct. 967, 971, 19 L.Ed.2d 1247] (1968)," and for that reason we held "that the jury should have been specifically instructed to consider the possibility of misidentification under the specific circumstances revealed by the evidence." *Holley*, 502 F.2d at 276. We deduce from this language and the conclusions reached by the Court that, under the rule in this Circuit, the *Telfaire* instruction, in the opinion of the trial judge, is compelled *only* where the evidence in the case "strongly suggests the 'likelihood of irreparable misidentification.'"

Our construction of *Holley* is in accord with the effect generally given to that decision in other cases, and is in accord with the rule followed in a majority of the decisions of other circuits. The general rule applied in those decisions normally—and one which is actually followed in both *Jones* and *Telfaire* and may be considered as declared and applied in *Holley*—is well expressed in *United States v. Thoma*, 713 F.2d 604 (10th Cir.1983):

> Other circuits have strongly urged the giving of such an instruction [*Telfaire* instruction] when identification is the main issue in a case and evidence of identification is *uncertain or qualified*, but have stopped short of saying that failure to give the instruction is reversible error in every case.

*Id.* at 607 (emphasis added) (citing, among other cases including specifically, *Telfaire* and *Holley*).

The Second Circuit, after thoroughly canvassing the issue and the decisions, adopted generally the rule stated in *Thoma*, describing it as the "flexible" rule, and gave the reasons for adopting this "flexible" rule in *United States v. Luis*, 835 F.2d 37, 41 (2d Cir.1987):

We believe this flexible approach remains the better course because it avoids imposing rigid requirements on trial courts under the threat that failure to give the requested charge will later be grounds for automatic reversal. In addition, such compulsion would mandate that the special identification charge be given in every case where identification is implicated—as it so often is—even though the *Neil v. Biggers* factors (discussed below) persuasively indicate the strong reliability of defendant's identification as a participant in the crime charged. *See Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). Finally, because the trial judge is in the best position to evaluate whether this charge is needed in the case before it, adopting a rigid requirement cuts back on the trial court's discretion in the conduct of a trial without any assurance that the fair administration of justice is thereby enhanced. Leaving the jury charge to the trial court's discretion means that an appellate court is called upon to decide only whether the failure to give a special eyewitness identification charge under the circumstances of a given case constitutes such an abuse of the trial court's discretion as to be reversible error.

■ We find the rule followed by the Second Circuit in *Luis* to be sound. Applying that rule to the circumstances of this particular case, the identification testimony was clear, certain and positive. The identifying witness knew well both Johnson and Brooks. For four months, he had as his cellmate Johnson. Brooks, a nephew of Johnson, visited Johnson in this cell practically every day. These facts are thus significantly different from those in *Holley*, where the testifying witness had never seen the defendant before the robbery, and where when the witness made his identifi-

cation, the face of the defendant had been muffled and obscured by a jacket. The defendants seek to discover situations in the record here that would weaken or "qualify" the strength of Ford's identification of Johnson and Brooks as his assailants. They could not argue that Ford did not know well and intimately the two defendants. The defendants suggested, though, that in the Annex the lighting was blurred where the assault occurred and that such blurring could possibly have interfered with Ford's observation of his assailant.[1] However, Ford testified that there was lighting, and that the lighting was plainly adequate to permit easy recognition of the aggressors, especially of aggressors well known to him. The defendants offered no real proof to the contrary. An hour or so later that same night, after he was taken from the infirmary to the hospital, he told Sergeant Shipley that Brooks was one of his assailants.[2] Ford's identification was thus almost contemporaneous with the assault itself. It is true Ford did not identify Johnson as one of his assailants at the time, but about two weeks later, he did identify Johnson. His delay was not because he did not recognize Johnson, but Johnson was his cellmate and he may well have been hesitant to identify Johnson because of fear of retaliation.

The testimony of Little buttresses Ford's testimony that Johnson and Brooks were the other assailants. Little knew both Brooks and Johnson well. He had been with them a short time before Ford was seriously assaulted. At that time, Johnson and Brooks told Little they were going to beat up an inmate and invited Little to be a spectator at the assault. Little did not accept the invitation, but he did walk over to the television room where he had a clear vision of the door to the Annex. He saw Brooks and Johnson go into the Annex.

---

1. FBI Agent Lund was told by Ford, though, that "the room [where the assault occurred] was darkened, that the main lights were off, but that there were some other personal lamps that were lit in the space, and that he was able to see."

2. When he first was seen at the Prison infirmary, he told the examining officer, Corporal

Hunt, that he had "got stabbed by two or more inmates." He did not give her at the time the names of his assailants. Corporal Hunt apparently did not seek details from Ford because, as she explained, "most of my job is to get the medical attention that he needed."

Shortly afterwards, he observed Ford open the door and walk in. A few moments later, Ford emerged, bleeding and holding his abdomen, where he had been stabbed. Shortly after Ford had emerged bleeding from the Annex, Brooks came out of the Annex. This evidence significantly bulwarked Ford's testimony and lent conviction to his identification testimony. Johnson's failure to emerge is understandable, since his cell was in the Annex, whereas Brooks' was in another area.

In summary, we are of the opinion that this evidence of Ford's identification of Brooks and Johnson was so overwhelming that neither of the defendants was prejudiced by the court's failure to give the *Telfaire* instruction. The reasons for a cautionary instruction as found in *Holley* were not present in this case. There was no "strong likelihood of misidentification," nor was there uncertainty or qualification (*Thoma*) in the identification testimony, nor were there any "special difficulties" in the identification testimony as *Telfaire* suggests may justify a cautionary instruction. For that reason, we find, as did the court in *Telfaire*, no basis for reversal of the convictions herein because of the failure to give the particularized identification instruction.

### III.

■ The defendants raise another claim of error in the jury's instructions because of the refusal by the district court to give the cautionary instruction for informer's testimony as set forth in Section 17.02 of *Devitt and Blackmar's Jury Practice and Instructions* (3d ed. 1977), in connection with the testimony of Little. As the court in *United States v. Miller*, 499 F.2d 736, 741 (10th Cir.1974), said, most any individual who volunteers testimony can be said to be an informer. But no decision we have located has held that every witness who voluntarily testifies to relevant evidence is to be treated as an "informer" whose testimony must be the subject of a cautionary instruction. Under the authorities, an informer cautionary instruction is only appropriate when "the individual supplying the

information generally is either paid for his services or, having been a participant in the unlawful transaction, is granted immunity in exchange for his testimony." *United States v. Miller*, 499 F.2d at 742. This principle has been incorporated by *Devitt and Blackmar* in their instruction which the defendants contend should be given here. That instruction, by its terms, provides:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest or by prejudice against a defendant.

■ In this case, there is no evidence that Little met these requirements for characterization as an "informer" whose testimony required a cautionary instruction. He was paid nothing, nor was he promised immunity for his testimony, nor did he seek "personal advantage or vindication" by his testimony. The defendants sought to imply that Little had received some preferential treatment at the hands of the prison authorities before he testified at the grand jury hearing in this proceeding as evidence of "personal advantage." However, Little testified in this trial that certain charges against him made while he was in protective custody had been dismissed a month or so before he testified before the grand jury here, and such dismissal could not, therefore, have influenced in any way his grand jury testimony. There was also some testimony that Little and Johnson had earlier had a romantic relationship, but that the relationship had ended some time before the assault involved here. The defendants suggested that Little was angry with Johnson because the latter had terminated the relationship and sought to avenge himself on Johnson. Little claimed, however, that he, not Johnson, had terminated the relationship and he declared that he remained a friend of Johnson. The existence of such relationship is substantiated by the fact that Little, John-

son, and Brooks were "fraternizing" together before the assault on Ford, and Johnson had asked Little to accompany him and Brooks to witness the beating the two of them expected to inflict on Ford. It is true that Wheeler Bey, another Lorton inmate, testified that he had a short conversation on one occasion with Little, who "asked [him] could I unite their relationship" (i.e., that between Johnson and him) and when he told Little "that was impossible," Little "got upset at [him]." Certainly, that shows no spirit of vindictiveness on Little's part against Johnson, whatever it might indicate of Little's feelings toward Wheeler Bey. There simply was no basis in this record for a cautionary "informer" instruction in connection with Little's testimony.[3]

The defendants, however, cite *People of Territory of Guam v. Dela Rosa*, 644 F.2d 1257 (9th Cir.1980), as precedent for their contention. That decision is clearly not on point. In that case, the defendant was charged with the murder of three school teachers from Japan who had been vacationing in Guam. Some of the clothing of the murdered teachers was found at the home of the witness Gumataotao. Gumataotao quickly became a suspect in the murder. He admitted "that he [had] helped Dela Rosa [the defendant] get rid of the murder weapon and the property stolen from the victims, but told the police that Dela Rosa was the man who attacked them." The court found that "Gumataotao's testimony was secured by a promise not to prosecute him in exchange for his cooperation." By his own testimony, he was at the least an accessory after the fact in the case. Arguably, the promise of the authorities not to prosecute could be construed as a form of "immunity." In any event, "the promise must be construed as securing Gumataotao a very significant personal advantage. Certainly, the possibility of unreliable testimony by a witness to gain this kind of personal advantage is as acute as the situation where a witness testifies for pay or official immunity." *Id.* at 1259. Gumataotao was actually an accomplice who had been promised immunity for his testimony. The court properly concluded that the denial of the instruction was improper because of the grant of immunity to the witness for his testimony. We agree with that ruling. But the facts in this case are quite different from those in *Dela Rosa*.

Little's testimony in this case, contrary to the facts in *Dela Rosa*, "was [not] secured by a promise not to prosecute him in exchange for his cooperation." His testimony resulted from a conversation between Ford and Little when both were patients in the prison unit of the hospital. No official of Lorton or of the investigating officer group or of the prosecution staff ever made Little any offer to induce him to testify, nor has there been produced any evidence that Little had received any preferential treatment by the government in return for his testimony. Nor was Little an accomplice, as was the witness in *Dela Rosa*. This case is in no way similar to the case of *Dela Rosa*. There was no requirement in this case of an informer cautionary instruction. We accordingly find this claim of error without any merit.

## IV.

■ The defendant Brooks *separately* raises the point that his co-defendant's counsel attempted to enter into evidence information about a "photographic identification spread" which prejudiced him in two ways.[4] First, the government's failure to advise him of this so-called photographic spread following his proper demand for

---

3. It is interesting that the defendants sought to use Wheeler Bey also as a character witness against Little, Bey testifying that Little had "a very poor reputation for truthfulness." However, Bey's own credibility was minimal. He had had two armed robbery convictions, as well as a conviction for heroin trafficking in the prison. He was hardly a credible character witness. We would attach no weight to this character testimony of Wheeler Bey.

4. The defendant Johnson does not join in this objection, presumably because he was the party who brought the matter up and because he later withdrew the offer of the evidence.

such a spread, if one existed, under his arguments, was prejudicial to his right to cross-examine effectively both Ford and Sergeant Shipley. There seems to be no question that Shipley did conduct what might be said to have been a haphazard photo spread. Called as a witness by counsel for the defendant Johnson, Sergeant Shipley testified that he did "do a photo identification with Mr. Ford." Nor was the evidence being offered by Johnson intended to identify or implicate Brooks. There was at that time no need for a photographic spread as a means of identifying Brooks as an assailant. Ford had already done that. Moreover, the so-called spread was a very jumbled display of a randomly selected group of pictures. Apparently, it was offered by Johnson for the purpose of questioning whether Ford could identify Johnson as one of his assailants. Unfortunately, for this purpose, though, Shipley was uncertain whether Johnson's picture was even in the photographs shown to Ford at the time.

At this point in the examination of Shipley, Brooks' counsel raised an objection to the testimony being offered by his co-defendant's counsel. At a bench conference out of the presence of the jury, Brooks' counsel said at the outset that he "had asked the Government if a photo spread occurred, and it was my understanding that no photo spread occurred." Counsel for the government responded that she "was not aware of any photo spread," that she had talked to Sergeant Shipley a number of times and that she had never been told "that any photos had been shown to the victim." At this point, Brooks' counsel asked the court to "instruct the jury to disregard any testimony concerning the photo spread." The judge reserved decision at the time, adding that "if the Government had brought this up, I would be very clear in my mind what to do with it, but it is your co-defendant that has brought it up."

Brooks' counsel later changed his position from a request for an instruction to a motion for a new trial. The district court denied the motion, stating:

Miss Straus represented to me that in good faith she was not aware of a photo spread. And she certainly didn't bring up any evidence of it. Obviously there were some photos shown to Mr. Ford. However, he had already clearly by the testimony that has been given by more than one witness, had already identified Mr. Brooks by name. It was somebody that he had known and had been around for some period of time.

This is not a case where somebody was assaulted by a stranger and somebody comes in with a photo spread.

And so, anything that has happened to Mr. Brooks is certainly harmless to him. It was brought up by the defense in any event. But there just is certainly nothing harmful. He knew Mr. Brooks long before this. He knew both of these defendants. And he really showed the photograph so that the people at Lorton could identify Mr. Brooks to apprehend him, if you will. He didn't use the photographs to identify him as the assailant. He was simply giving them information so they could go find Mr. Brooks.

So, your motion for a mistrial is denied.

Some discussion with counsel ensued after this ruling during a conference on jury instructions. During these discussions, the question became how the parties would be permitted to deal with this photographic episode in their jury arguments. The district court's ruling on this was:

Well, I don't think that the Government should argue that he looked at a photo spread to identify one of his assailants, because that is not the testimony. The testimony is he knew Mr. Brooks and had known him for some time. He didn't use the photographs for identification, except so the officer could know who to apprehend.

So, they shouldn't be permitted to argue that the looking at the photographs

had anything to do with identification in this case, because it really didn't.

With this ruling the discussion about the episode was concluded. We find no reversible error in the district court's handling of this episode. Neither defendant, as the district court correctly opined, suffered any prejudice.

### V.

■ The defendants have advanced a number of other claims which merit little discussion. They complain that the government failed to identify the "confidential informant, Charles Little, at an earlier stage of the judicial process." We have already dealt with the inaccurate characterization of Little as a "confidential informant." The government advised the defendants seven days before trial that it intended to call Little as a witness. Such advice provided the defendants sufficient time before trial to prepare for Little's testimony.

■ Next, it was argued that the district judge improperly denied the defendants the right to comment on the absence of a "missing witness," Rafael Bowler, another Lorton inmate. There was no showing that Bowler was missing. Bowler was not under the control of the government. It is well settled that "[t]he rule regarding missing witness instructions is that 'if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *United States v. Rollins,* 862 F.2d 1282, 1297 (7th Cir.1988) (citations omitted). Moreover, in this case the witness was equally available to both the defendants and the government. Either defendant could have subpoenaed him to appear and then examined him at trial. Neither chose to do so. Further, the defendants did not request a "missing witness" instruction at trial. Under these circumstances, neither side was entitled to argue to the jury the absence of Bowler or to draw any inferences from his absence.

■ Finally, the defendants assert prejudice because they were not allowed in cross-examination to inquire in some detail about Johnson's and Little's "romantic" relationship. That relationship was established in the evidence without objection. There was some dispute whether Johnson or Little had terminated the relationship. All of that was proved. The defendants wanted to go into the details of such relationship. Such an excursion into that type of relationship had nothing to do with the true issue in the case and was an irrelevant diversion. The district judge's ruling cutting off an extended inquiry into a largely irrelevant detail was one uniquely within the province of the trial judge and is only to be reversed for clear abuse of discretion. *Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). We find no abuse of discretion.

### CONCLUSION

Having reviewed all the claims of error of the defendants and having found them without merit, we affirm the judgments of conviction herein.

AFFIRMED.