**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-4179**
_____

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

      v.

SHENIKA GRAVES, a/k/a Shenika Nicole Graves,

              Defendant - Appellant.

_____

**No. 12-4209**
_____

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

      v.

LOXLY JOHNSON, a/k/a Desmond Williams,

              Defendant - Appellant.

_____

Appeals from the United States District Court for the District of Maryland, at Baltimore.  William D. Quarles, Jr., District Judge.  (1:10-cr-00799-WDQ-3; 1:10-cr-00799-WDQ-1)

_____

Argued:  September 18, 2013        Decided:  November 6, 2013

_____

Before GREGORY and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED**: Howard Margulies, Columbia, Maryland, for Appellant Shenika Graves.  Gary Allen Ticknor, Columbia, Maryland, for Appellant Loxly Johnson.  Joshua L. Kaul, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF**: Rod J. Rosenstein, United States Attorney, Philip S. Jackson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a jury trial, Appellants, Loxly Johnson (Johnson) and Shenika Graves (Graves), were convicted of conspiracy to import one kilogram or more of heroin and 500 grams or more of cocaine, 21 U.S.C. §§ 960(a)(1) and 963, pursuant to a one-count superseding indictment returned on January 4, 2011 by a federal grand jury sitting in the District of Maryland. The district court sentenced Graves to a term of twelve months and one day of imprisonment, and Johnson to 240 months' imprisonment. On appeal, Appellants raise a host of challenges to their respective convictions. We affirm.

I

Johnson and Graves first challenge the district court's denial of their respective motions to suppress. When considering the denial of a motion to suppress, our review of the district court's factual findings is for clear error and our review of its legal conclusions is de novo. United States v. Lewis, 606 F.3d 193, 197 (4th Cir. 2010). Because the district court denied the Appellants' respective motions below, we construe the evidence in the light most favorable to the government. United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008).

The district court held a suppression hearing for the Appellants on December 6, 2011. The credible evidence introduced at that hearing demonstrated as follows.

On December 17, 2010, a ship security officer for the Royal Caribbean M/V Enchantment of the Seas told United States Immigration and Customs Enforcement (ICE) agents that Gavin Excell (Excell) and other crew members might be smuggling narcotics on the ship. The next day, agents of the ICE Homeland Security Investigations (HSI) Seaport Group coordinated with Customs and Border Protection to inspect the ship's crew members when they arrived in Baltimore, Maryland.

At about 9:00 a.m. on December 18, 2010, the crew of the Enchantment of the Seas was allowed to disembark. Searching Excell, agents found three packages: one wrapped in duct tape in his pants and two molded to fit into his shoes. The package in his pants contained about 700 grams of heroin. The packages in his shoes contained a total of about 300 grams of cocaine.

After he was arrested and waived his Miranda[1] rights, Excell stated that he had picked up the drugs in Jamaica or the Dominican Republic with fellow crew members John Swart Garth (Garth) and an individual he knew as Kishurn, later identified

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

- 4 -

as Kishurn Neptune (Neptune), and he was to deliver them to someone called "Tony" at a nearby Wal-Mart.[2] Excell indicated that "Tony's" cell phone number was 757-236-6211. At some point while Excell was in custody, he received a call from cell phone number 757-576-2843, which was linked in a national database to Latoya Johnson.[3] The 757 area code is for Norfolk, Virginia.

Ronald Copeland (Detective Copeland), a detective with the Baltimore City Police Department and an ICE Task Force Officer, went to the Wal-Mart parking lot and found a black GMC Envoy (the Envoy) with Virginia plates. The Envoy was the only vehicle in the parking lot with Virginia plates. A check of the license plates revealed that the Envoy was registered to Latoya Johnson. A male, later identified as Johnson, and a female, later identified as Graves, were seen inside the Envoy.

At about 10:15 a.m., another male, later identified as Garth, walked up to the driver's window of the Envoy, spoke with the driver for a moment, then walked around to the rear passenger door, opened it, and entered the vehicle. Detective Copeland saw Garth, sitting in the back seat, bend his torso

---

[2] Excell, Garth, and Neptune were also charged in the one-count superseding indictment alleging a conspiracy to import heroin and cocaine. They pleaded guilty prior to Johnson and Graves's trial.

[3] Latoya Johnson is Johnson's daughter.

forward and reach toward the floorboard. According to Detective Copeland, Garth appeared to be "messing with his shoes or something." After a few minutes, Garth exited the Envoy and walked into the Wal-Mart. Later, he left the Wal-Mart and boarded a van used by cruise ship crew members to return to the ship.

At about 10:45 a.m., Johnson left the Envoy, entered the Wal-Mart, and was followed ten minutes later by Graves. Over the next hour, Johnson and Graves stayed inside the Wal-Mart, periodically scanning the parking lot from the entrance to the store. Graves once returned to the Envoy, sat in the driver's seat for about fifteen to twenty minutes, and then walked back to the Wal-Mart.

At about 11:30 a.m., Graves returned to the Envoy and moved it to another part of the parking lot while talking on her cell phone. Law enforcement officers saw Neptune wearing a Royal Caribbean jacket in the Wal-Mart parking lot. He walked around Detective Copeland's unmarked patrol car and stared directly at him. Detective Copeland understood him to be conducting counter-surveillance. Soon after, Detective Copeland saw Neptune, Graves, and possibly Johnson standing with their backs to each other for several minutes just outside the entrance to the Wal-Mart.

At about 12:30 p.m., Excell made two controlled calls to "Tony." The first call, to 757-236-6211, went to voicemail. The second call, to 757-576-2843, "Tony" answered. Excell told him that he had been delayed by an immigration check, but that he could be at the Wal-Mart in fifteen minutes. "Tony" responded that he was at the Wal-Mart, but he had to leave and could not accept drugs there because the area was "hot." "Tony" said he would call Excell back.

A few minutes later, Johnson left the Wal-Mart, got into the Envoy, and drove to a nearby gas station, with the law enforcement officers following the Envoy to such station. At this time, Graves was in the foyer of the Wal-Mart. Johnson stayed in the Envoy at the gas station for about five to ten minutes, then drove north on Hanover Street. He held his cell phone to his ear as he drove. At the same time, Excell, who was in an unmarked patrol car, received a call.

Law enforcement officers stopped the Envoy a few blocks later. Johnson was ordered out of the Envoy and handcuffed. At the time, Johnson had a cell phone to his ear, which was seized.[4] HSI Special Agent Roger Cochran (Special Agent Cochran) examined the call log to Johnson's cell phone and discovered that, at

---

[4] The cell phone number of the cell phone seized from Johnson was 757-576-2843. The cell phone corresponding to cell phone number 757-236-6211 was never recovered.

12:36 p.m. that day, Johnson's cell phone had received a call from "Shp-Gavn," cell phone number 757-576-0399, a cell phone number that Special Agent Cochran recognized as Excell's cell phone number. Johnson initially consented to a search of the Envoy, but soon said the vehicle was not his and revoked his consent.

A Baltimore City Police Department canine sniffed the Envoy with negative results. Law enforcement officers then searched the Envoy, finding $8,000 in cash under the lining of a child safety seat in the backseat.

Meanwhile, two HSI Special Agents, Alex Feres (Special Agent Feres) and Harry Freeman (Special Agent Freeman), and Detective Copeland, approached Graves in the Wal-Mart foyer and identified themselves. Special Agent Feres asked Graves if she would speak to them "in private." Graves agreed and walked with the law enforcement officers to Special Agent Freeman's unmarked patrol car. Prior to getting into Special Agent Freeman's patrol car, Graves was told she was not under arrest, she did not have to engage in the conversation if she did not want to do so, and she could "stop the conversation." The law enforcement officers were not wearing bullet-proof vests or showing their weapons, and they did not touch Graves. Special Agent Feres asked for Graves's consent to quickly look through her Wal-Mart bag and purse to check for weapons. Special Agent Freeman then

checked these items, removing only Graves's wallet to look for identification.

Once in the patrol car, Graves indicated that she had come to Baltimore from Virginia that morning with Johnson, a drug trafficker, to meet someone from a cruise ship. Graves said that an unknown man had entered the Envoy earlier that day and had given them three packages in return for $4,000 and that the "stuff" was in her purse. Graves began to cry as she was arrested. Special Agent Feres read Graves her Miranda warnings after she stopped crying, about ten minutes later. She waived her rights orally and in writing. The law enforcement officers searched her purse after the arrest and found three duct-taped packages, similar to the ones Excell had, containing about 700 grams of heroin and 300 grams of cocaine.

Graves received several phone calls while she was with the law enforcement officers. Following her arrest, Special Agent Feres asked if she could answer them, and when she said yes, he told her to answer. The first call was from a person in Virginia, stating that he was worried "about Johnson's status." The second call was from a person apparently using an overseas phone, asking Graves if she had "the stuff." She told the caller she had it, but was stuck at the Wal-Mart. The person on the other end of the call said that he would have someone pick her up.

Johnson contends that the law enforcement officers lacked probable cause to arrest him, search his cell phone, and search the Envoy. We disagree.

The Fourth Amendment provides in relevant part that the people are "to be secure in their persons . . . against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Under the Fourth Amendment, if supported by probable cause, an officer may make a warrantless arrest of an individual in a public place. Maryland v. Pringle, 540 U.S. 366, 370 (2003). "Probable cause" sufficient to justify an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

Determining whether an officer has probable cause involves an inquiry into the totality of the circumstances. Pringle, 540 U.S. at 371. This inquiry does not involve the application of a precise legal formula or test but the commonsense and streetwise assessment of the factual circumstances. Id. at 370-71. The Court in Pringle emphasized that the probable-cause standard is "a practical, nontechnical conception that deals with the

factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. at 370 (citations and internal quotation marks omitted). In assessing the totality of the circumstances, it is appropriate to consider an officer's practical experience and the inferences the officer may draw from that experience. Ornelas v. United States, 517 U.S. 690, 700 (1996).

In this case, there was probable cause to arrest Johnson. When Johnson was arrested, the officers knew that Excell, who had been caught with about one kilogram of drugs on his person, was planning to deliver the drugs to a man called "Tony" in the Wal-Mart parking lot and claimed that other crew members were making similar deliveries. One of the contact numbers for "Tony" was a Norfolk, Virginia cell phone number registered to a Latoya Johnson. The Envoy, the only vehicle in the Wal-Mart parking lot with Virginia license plates, was also registered to Latoya Johnson. Johnson and Graves had been sitting in the Envoy in the Wal-Mart parking lot or looking at the parking lot from the store for almost two hours at about the time Excell was to deliver the drugs. While they were in the Envoy, an unknown man, who later got into a cruise ship van, entered the Envoy for a few moments bent over as if to remove something from his shoes, and then quickly left the vehicle. Shortly thereafter, Graves moved the Envoy to another part of the parking lot.

Neptune, wearing Royal Caribbean apparel, conducted counter-surveillance on the parking lot and was seen standing next to Johnson and Graves at the Wal-Mart entrance. On the heels of this activity, "Tony" told Excell that he was leaving the Wal-Mart, and Johnson drove away from the parking lot. Johnson drove to a gas station, but never bought gas or used the convenience store. All of these facts provided the law enforcement officers the necessary probable cause to arrest Johnson. Because Johnson's arrest was lawful, the seizure and search of his cell phone was lawful as well. See United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009) (holding that officers may seize cell phones incident to an arrest and retrieve text messages and other information without a search warrant).

Turning to Johnson's challenge to the search of the Envoy, that search was valid under the automobile exception to the warrant requirement because the government had probable cause to believe the Envoy contained drugs. See United States v. Ross, 456 U.S. 798, 825 (1982) (noting that a warrant is unnecessary for an automobile search supported by probable cause); United States v. Dickey-Bey, 393 F.3d 449, 456 (4th Cir. 2004) (same). In addition to the evidence set forth above that provided probable cause to arrest Johnson, the law enforcement officers knew from Johnson's cell phone call log that he had just

- 12 -

received a call from Excell. The totality of the circumstances amply support the conclusion that there was probable cause to search the Envoy. Id.

B

For her part, Graves argues that the district court erred when it refused to suppress certain statements she made to the law enforcement officers. According to Graves, the law enforcement officers procured these statements in violation of Miranda.

"Statements obtained from [a] defendant during custodial interrogation are presumptively compelled," in violation of the Fifth Amendment, unless the government shows "that law enforcement officers (1) adequately informed the defendant of her Miranda rights and (2) obtained a waiver of those rights." United States v. Cardwell, 433 F.3d 378, 388-89 (4th Cir. 2005) (footnote omitted). To determine whether a defendant was in custody for Miranda purposes, courts are to determine "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995) (footnote omitted). In other words, "[a]n individual is in custody when, under the totality of the circumstances, a suspect's freedom from action is curtailed to a degree

- 13 -

associated with formal arrest." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007) (citation and internal quotation marks omitted). In conducting the custody inquiry, it is important to remember that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).

In support of her argument, Graves seems to emphasize that she was questioned in a patrol car by three law enforcement officers and the law enforcement officers were vigorously pursuing a drug investigation. However, the Supreme Court has made clear that neither the location nor the purpose of the interview is dispositive of whether a suspect is in custody. See Yarborough v. Alvarado, 541 U.S. 652, 656-66 (2004) (upholding state court determination that the respondent, a juvenile, was not in custody during his two-hour interview, despite the fact that he was dropped off at the police station by his parents at police request and was not told that he was free to leave); Stansbury v. California, 511 U.S. 318, 325 (1994) (holding that a clear statement by a police officer that the person being questioned is a suspect does not alone determine custody, but is only "one among many factors" that

bear on an assessment of whether a reasonable person would feel free to depart); California v. Beheler, 463 U.S. 1121, 1125 (1983) ("But we have explicitly recognized that Miranda warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.") (citation and internal quotation marks omitted); Mathiason, 429 U.S. at 495 (holding that Miranda warnings are not required when a suspect voluntarily accompanies the police to the police station, answers questions, and then is allowed to leave).  Moreover, the number of law enforcement officers present here, three, does not bolster Graves's argument.  See, e.g., United States v. Nishnianidze, 342 F.3d 6, 12-14 (1st Cir. 2003) (holding no custody despite the presence of three law enforcement officers); United States v. Quinn, 815 F.2d 153, 157-61 (1st Cir. 1987) (holding no custody despite the presence of five officers).

In our view, Graves was not in custody so as to trigger the Miranda requirements.  Special Agent Feres asked Graves if she would speak to the law enforcement officers "in private."  Prior to getting into Special Agent Freeman's patrol car, Graves was told that she was not under arrest, she did not have to answer questions if she did not want to do so, and she could "stop the conversation."  Cf. Colonna, 511 F.3d at 435 (holding that informing a suspect that he was not under arrest was a factor in

assessing the totality of the circumstances). The law enforcement officers did not wear bullet-proof vests, show their weapons, or touch Graves. Cf. United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (noting that "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled" were factors in the custody analysis) (citation and internal quotation marks omitted). Under the totality of the circumstances, a reasonable person in Graves's shoes would have felt that she was at liberty to terminate the questioning at any time and leave. Keohane, 516 U.S. at 112.[5]

---

[5] Graves also argues that, even assuming she was not in custody for Miranda purposes, her statements to the law enforcement officers were inadmissible because they were procured in violation of the Due Process Clause of the Fifth Amendment, which provides in relevant part "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. amend. V. A statement is involuntary under the Due Process Clause of the Fifth Amendment if it was extracted by "any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (citations and internal quotation marks omitted). In our view, Graves's due process argument fails because no coercive police activity was present. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

Johnson also raises three trial-related issues on appeal. The evidence presented by the government at trial was similar to the evidence presented by the government at the suppression hearing. Detective Copeland, Special Agent Cochran, and Special Agent Feres were the government's three witnesses at the suppression hearing, and they all testified at the trial. Excell, who did not testify at the suppression hearing, was the government's only other witness at the trial. He testified extensively about the particulars of the importation scheme. Of note, the government's use of Graves's statements to the law enforcement officers was limited by the dictates of Bruton v. United States, 391 U.S. 123, 126 (1968) (holding a defendant is deprived of his rights under the Confrontation Clause when a codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant). Neither Johnson nor Graves argue that their respective convictions run afoul of Bruton.

A

Johnson contends that the district court, during the trial, should have sua sponte severed his trial from Graves's trial. The failure to order a severance sua sponte is reviewed for plain error. United States v. Hart, 273 F.3d 363, 369-70 (3d

Cir. 2001). To demonstrate plain error, a defendant must show that: (1) there was an error; (2) the error was plain; and (3) the error affected his substantial rights. United States v. Olano, 507 U.S. 725, 732 (1993). Even if these elements are established, the decision to correct the error lies within our discretion, and we exercise that discretion only if "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 732 (citation, alteration, and internal quotation marks omitted).

At the suppression hearing on December 6, 2011, Special Agent Cochran testified that he did not know the cell phone number of the cell phone seized from Johnson on the day of his arrest. That evening, Special Agent Cochran retrieved the cell phone number (757-576-2843) from the cell phone seized from Johnson and conveyed this information to the Assistant United States Attorney (the AUSA) handling the case. The AUSA promptly notified Johnson's counsel the following day, the first day of trial, who responded with an oral motion in limine to prevent the government from introducing this evidence. The district court granted the motion, concluding that the government's disclosure to Johnson was late.

At trial, counsel for Graves introduced into evidence the records of Graves's cell phone activity around the time of her arrest (December 18, 2010). These records showed that there was

a common cell phone number called by both Excell's and Graves's cell phone on December 18, 2010. Graves's counsel was able to elicit testimony from Special Agent Cochran that the common cell phone number was attributable to the cell phone seized from Johnson on the day of his arrest.

Johnson timely objected to Special Agent Cochran's testimony, but the district court overruled the objection. Johnson now claims that, if the district court was going to permit the introduction of this evidence, it was required to sua sponte sever his trial from Graves's trial. According to Johnson, the introduction of this evidence rendered his defense mutually antagonistic to Graves's defense.

Two or more defendants may be charged in the same indictment if they are alleged to have "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Generally, we adhere to the principle that defendants indicted together should be tried together, and a defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard. United States v. Strickland, 245 F.3d 368, 384 (4th Cir. 2001); see also Zafiro v. United States, 506 U.S. 534, 539 (1993) (noting that courts should grant severance "only if there is a serious risk that a

joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); United States v. Harris, 498 F.3d 278, 291 (4th Cir. 2007) (noting that a district court abuses its discretion "only where the trial court's decision to deny a severance deprives the defendants of a fair trial and results in a miscarriage of justice") (citation and internal quotation marks omitted); Fed. R. Crim. P. 14(a) ("If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Moreover, a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. Zafiro, 506 U.S. at 540.

The presence of conflicting or antagonistic defenses alone does not require severance under Rule 14(a). Id. at 538. "The mere presence of hostility among defendants . . . or the desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials." United States v. Spitler, 800 F.2d 1267, 1271 (4th Cir. 1986) (citation, alterations, and internal quotation marks omitted). The antagonistic defenses must involve more than "finger pointing."

United States v. Najjar, 300 F.3d 466, 474 (4th Cir. 2002). Instead, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, . . . or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Id. (citation and internal quotation marks omitted).

Johnson's defense at trial was that the government introduced no evidence suggesting that he had any knowledge of the drugs found in Graves's purse. In asserting this defense, Johnson's counsel emphasized that: (1) the cell phone seized from Johnson on the day of his arrest was never introduced into evidence; (2) the cell phone corresponding to cell phone number 757-236-6211 was never recovered; (3) the canine did not alert on the Envoy; (4) there was no evidence that he had any knowledge of the $8,000 found in the Envoy, including the lack of any fingerprint evidence; (5) there was no evidence that a transaction took place after Garth entered the Envoy because his hands were not seen handing drugs over; and (6) nothing sinister could be drawn from Johnson's actions at the Wal-Mart because they were innocuous and done in a crowded place in broad daylight.

Graves's defense was similar to that of Johnson's. Her defense was that, like Johnson, she had no knowledge of the

drugs found in her purse. According to Graves's counsel, the drugs could have gotten into her purse in any number of ways without her knowledge. This point, according to her counsel, was underscored by the fact that drugs were not found in the protective search of the purse. Counsel for Graves also emphasized that Excell was supposed to deliver the drugs to a man named "Tony" and not to a woman. This point was underscored by the calls Excell made to "Tony" and the absence of evidence that Excell ever contacted Graves. As for her statements to the law enforcement officers, Graves's counsel posited that Graves did not make the statements and, even if she did, such statements were involuntary under the circumstances. Counsel for Graves also downplayed the significance of the calls received by Graves while she was in the company of the law enforcement officers, suggesting that "somebody that knew her number and knew she was there had suggested to somebody that they call her just to check the status." Finally, counsel for Graves emphasized that Graves's actions at the Wal-Mart, though a little unusual, were not indicative of criminal activity, especially since Graves was not in a position to return to Virginia on her own and, given the time of year, it probably was warmer in the Wal-Mart than in the Envoy.

In our view, Johnson's and Graves's defenses, while conflicting on certain points, were not mutually antagonistic to

the point where the jury was required to believe the core of one defense and disbelieve the core of the other. In order to convict Johnson, the jury was not required to believe Graves's defense that she was not a participant in the conspiracy. Rather, to convict Johnson, the jury was required to find that he knowingly participated in the conspiracy. Such a conviction did not rest on the jury's acceptance of Graves's defense. In other words, the jury was free to disbelieve both Johnson's and Graves's versions of the events and conclude they both participated in the conspiracy. Such a conclusion did not rest on the belief of one defendant's defense and the disbelief of the other defendant's defense. See id. (noting that defenses were not mutually antagonistic where defendant's guilt was not dictated by the asserted innocence of his co-defendants). In sum, in this case, "it is not so much that the defenses were antagonistic to each other as it is that the evidence was antagonistic to those defenses." United States v. Frazier, 394 F.2d 258, 261 (4th Cir. 1968).

B

Johnson claims that the district court erred when it denied his request for a missing witness instruction. We review the district court's refusal to grant a defendant's request for a jury instruction for an abuse of discretion. United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009).

- 23 -

Prior to the instant trial, Garth pleaded guilty to the charged conspiracy and entered into a plea agreement with the government whereby he had agreed to testify truthfully if called to testify.  At the time of trial, Garth was in custody awaiting sentencing.  At trial, the government decided not to call Garth, prompting Johnson to request a missing witness instruction in his proposed jury instructions.  The district court denied this request, and Johnson argues this ruling was in error.  According to Johnson, Garth's plea agreement with the government rendered him unavailable to the defense and, in any event, Johnson could not compel Garth to testify for the defense.  Johnson further posits, in a speculative fashion, that Garth's testimony would have been helpful to his defense.

The Supreme Court announced the underlying rationale for "missing witness" instructions in Graves v. United States, 150 U.S. 118 (1893): "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."  Id. at 121.  To qualify for such an instruction, two requirements must be met.  First, it must be shown that the party failing to call the witness has it peculiarly within its power to produce the witness.  United States v. Brooks, 928 F.2d 1403, 1412 (4th Cir. 1991).  This requirement can be satisfied

by showing either (1) that the witness is physically available only to the other party, or (2) that, because of the witness's relationship with the other party, the witness "pragmatically" is only available to that party.  United States v. Rollins, 862 F.2d 1282, 1297 (7th Cir. 1988); see also United States v. Spinosa, 982 F.2d 620, 632 (1st Cir. 1992) (missing witness instruction proper when the witness is "so 'clearly favorably disposed' to the other party").  Second, the witness's testimony must elucidate issues important to the trial, as opposed to being irrelevant or cumulative.  Brooks, 928 F.2d at 1412.

In this case, Johnson cannot get beyond the first requirement.  A witness is not unavailable merely because he cooperates with the government.  See Rollins, 862 F.2d at 1298 (holding that an inmate equally available to both the government and the defense is not pragmatically unavailable simply because he was also a government informant); Spinosa, 982 F.2d at 632 (holding that a witness is not pragmatically unavailable simply because he is a paid government informant).

Moreover, Johnson has produced no evidence that Garth was accessible only to the government or that Garth could not have been subpoenaed to testify at trial.  Reduced to its essence, then, Johnson's claim of entitlement to the missing witness instruction rests on his contention that, because Garth was in federal custody, he was available only to the government.  This

contention, however, is incorrect. Johnson could have asked the district court to issue a writ of habeas corpus <u>ad testificandum</u>, thereby requiring Garth's presence at trial to testify. 28 U.S.C. § 2241(c)(5); <u>see also</u> <u>Muhammad v. Warden, Baltimore City Jail</u>, 849 F.2d 107, 114 (4th Cir. 1988) (holding that a writ of habeas corpus <u>ad testificandum</u> may be issued extraterritorially by the district court). There is no indication in the record that Johnson made such a request. And the fact that Garth may have invoked his Fifth Amendment privilege against self-incrimination is of no moment. <u>United States v. St. Michael's Credit Union</u>, 880 F.2d 579, 598 (1st Cir. 1989) (holding that a "witness'[s] decision to invoke his fifth amendment privilege against testifying makes him neither peculiarly available to the government nor within the government's exclusive control"). There was no abuse of discretion by the district court.

C

Finally, Johnson challenges the sufficiency of the evidence to support his conviction. "A defendant challenging the sufficiency of the evidence . . . bears a heavy burden." <u>United States v. Beidler</u>, 110 F.3d 1064, 1067 (4th Cir. 1997) (citation and internal quotation marks omitted). We will uphold the jury's verdict "if, viewing the evidence in the light most favorable to the government, it is supported by substantial

- 26 -

evidence." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (citation and internal quotation marks omitted). In reviewing for substantial evidence, we consider both circumstantial and direct evidence and allow the government all reasonable inferences from the facts shown to those sought to be established. United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008).

To be found guilty of conspiracy to import heroin and cocaine, the government must prove: (1) an agreement to import heroin and cocaine between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of the conspiracy. See generally United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). The government may establish the existence of a conspiracy wholly by circumstantial evidence. Id. at 858. And "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). "Once a conspiracy has been proved, the evidence need only establish a slight connection between any given

defendant and the conspiracy to support conviction." Strickland, 245 F.3d at 385.

A conspiracy conviction will be upheld by this court "even if the defendant's involvement is minimal." United States v. Allen, 716 F.3d 98, 103 (4th Cir. 2013). Consequently, "a defendant may be convicted of conspiracy to [import] even if the evidence shows participation in only one level of the conspiracy charged in the indictment." Id. (citation and internal quotation marks omitted).

Whether there was a conspiracy to import heroin and cocaine in this case is not in dispute. Excell and others were enlisted to import heroin and drugs into the United States and did so. The question is whether there is sufficient evidence in the trial record to support the conclusion that Johnson knew of the conspiracy and voluntarily became a part of it. In our view, such sufficient evidence is in the trial record.

Under his dominion and control, Johnson possessed a large sum of money. Such evidence supports the conclusion that some of this money was to be paid to Excell. Although Johnson's presence at a Wal-Mart far away from home is not telling in and of itself, the length of time he spent there and the actions he took while there strongly suggest that he was participating in the importation scheme. His interaction with Garth, first at the driver's side window of the Envoy and then in the vehicle as

Garth appeared to remove something--such as a drug pack--from his shoes further bolsters such a conclusion, as does the furtive movements Johnson took while he was at the Wal-Mart. Moreover, because Johnson did not leave once the Garth transaction was concluded, the jury was free to conclude that Johnson was waiting for a delivery from Excell. Finally, there is plenty of evidence in the record to support the conclusion that "Tony" and Johnson were the same person. In view of the overwhelming evidence of guilt in the trial record, Johnson's sufficiency of the evidence challenge must be rejected.

### III

For the reasons stated herein, the judgments of the district court are affirmed.

AFFIRMED